**2026 WI 26**

# Supreme Court of Wisconsin



RACINE COUNTY,
*Petitioner-Respondent*,

*v.*

R.P.L.,
*Respondent-Appellant-Petitioner*.

No. 2025AP813-FT

Decided July 7, 2026

REVIEW of a decision of the Court of Appeals

Racine County Circuit Court (Timothy D. Boyle, J.) No. 2023GN73

SUSAN M. CRAWFORD, J., delivered the majority opinion of the Court, in which JILL J. KAROFSKY, C.J., and ANNETTE KINGSLAND ZIEGLER and BRIAN K. HAGEDORN, JJ., joined. BRIAN K. HAGEDORN, J., filed a concurring opinion in which SUSAN M. CRAWFORD, J., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion. REBECCA FRANK DALLET, J., filed a dissenting opinion. JANET C. PROTASIEWICZ, J., filed a dissenting opinion in which REBECCA FRANK DALLET, J., joined.

¶1 SUSAN M. CRAWFORD, J. Robert[1] appeals an order continuing his protective placement in an adult family home under WIS.

---

[1] For ease of reading and to protect the confidentiality of these proceedings, we use the pseudonym "Robert" to refer to the defendant in this case.

STAT. §§ 55.08(1), 55.12, and 55.18(3) (2023–24).[2] We first hold that Robert's appeal from the order continuing the protective placement was not rendered moot by a subsequent court order continuing the protective placement in 2025. We address the standards of review that apply in reviewing the sufficiency of the evidence to support an order of protective placement. Finally, in our de novo review, we hold that the evidence was sufficient to support the circuit court's order to continue Robert's protective placement. Accordingly, we affirm the court of appeals.

## I.  BACKGROUND

¶2      On May 31, 2023, a Meals on Wheels food delivery service worker found 65-year-old Robert lying on the floor in his Racine home and brought him to a local hospital. The hospital filed a petition for the appointment of a guardian under WIS. STAT. § 54.40 and an order for protective placement under WIS. STAT. § 55.08. The petition stated that Robert had a history of stroke, a seizure disorder, an anxiety disorder, and aphasia (a language disorder). It stated that Robert suffered from severe confusion, memory loss, poor judgment, and poor insight. It alleged that Robert was unable to make informed health care or financial decisions on his own. After a hearing on August 8, 2023, the circuit court entered orders for guardianship and protective placement, specifying that the least restrictive placement consistent with Robert's needs was an unlocked unit and recommending placement at a "nursing/rehabilitation facility or community based residential facility." Robert was transferred to a nursing/rehabilitation facility shortly thereafter. A few months later, he was transferred to an adult family home.[3]

¶3      In June 2024, as part of an annual review of the protective placement, Robert's guardian filed a written report stating that Robert continued to meet the standards for protective placement under WIS. STAT. § 55.08(1) and that the adult family home in which he was residing was the least restrictive placement, given his needs. The guardian's report

---

[2] All subsequent references to the Wisconsin Statutes are to the 2023–24 version unless otherwise indicated.

[3] As relevant to this case, an "adult family home" is "[a] place where 3 or 4 adults who are not related to the operator reside and receive care, treatment or services that are above the level of room and board and that may include up to 7 hours per week of nursing care per resident." WIS. STAT. § 50.01(1)(b).

noted that Robert had requested an independent evaluation, modification or termination of the protective placement, appointment of adversary counsel, and a full due process hearing. Accordingly, the circuit court appointed counsel for Robert and ordered an independent evaluation by Dr. Steven Braam, a licensed psychologist.

¶4     The circuit court held a hearing on the continuation of the protective placement on August 9, 2024. Dr. Braam was the only witness who testified and his evaluation report was received into evidence. He expressed opinions regarding Robert's diagnoses, his mental and physical incapacity, and the permanency of his cognitive impairments. The circuit court made findings of fact and ruled that the County had met its burden of proving by clear and convincing evidence that Robert met the criteria for protective placement. Accordingly, it entered orders for the continuation of Robert's guardianship and protective placement.

¶5     Robert appealed the 2024 order to continue the protective placement, arguing that the County failed to prove two of the statutory criteria at the annual review hearing: that his incapacity endangered himself or others and that his disability was permanent.[4] The court of appeals rejected these arguments and affirmed the circuit court order.

## II.  DISCUSSION

### A.  MOOTNESS

¶6     As an initial matter, we discuss whether Robert's appeal of the 2024 order is moot, given that the circuit court issued another order in 2025 continuing the protective placement, which Robert did not appeal. We hold that Robert's appeal of the 2024 order is not moot.

---

[4] These are the only issues Robert raised in his appeal from the order continuing the protective placement. In her dissent, Justice Bradley suggests that protective services provided in Robert's own home would have been "the least restrictive environment and . . . the least restrictive manner consistent with [his] needs." *See* Justice Bradley's dissent, ¶68. However, Robert raises no issue on appeal contesting the circuit court's finding that the adult family home was the least restrictive placement consistent with his needs. Notably, Robert's guardian ad litem reported to the circuit court that Robert refused services or help in his home.

¶7 Mootness is a question of law this court reviews de novo. *PRN Assocs. v. DOA*, 2009 WI 53, ¶25, 317 Wis. 2d 656, 766 N.W.2d 559. "An issue is moot when its resolution will have no practical effect on the underlying controversy." *Id.* Accordingly, appellate courts generally do not rule on moot issues. *State ex rel. Riesch v. Schwarz*, 2005 WI 11, ¶12, 278 Wis. 2d 24, 692 N.W.2d 219.

¶8 The County argues that the order continuing Robert's protective placement in 2025—which Robert did not contest or appeal—renders his appeal moot because he is no longer subject to the 2024 protective placement order. The County contends that vacating the 2024 order would have no practical effect, noting that Robert was not assessed costs for the hospital's attorney's fees related to the filing of the petitions for protective placement and guardianship.[5] As such, the County urges this court to decline to rule on the merits of this case.

¶9 Robert contends that the appeal is not moot because collateral consequences of the 2024 protective placement order persist, in the form of liability for the costs of his care. We have recognized, in a variety of contexts, that an appeal is not moot if "the direct or collateral consequences of the order persist and vacatur of that order would practically affect those consequences." *Sauk County v. S.A.M.*, 2022 WI 46, ¶19, 402 Wis. 2d 379, 975 N.W.2d 162 (considering collateral consequences of involuntary civil commitment order on mootness); *see also State v. Theoharopoulos*, 72 Wis. 2d 327, 333, 240 N.W.2d 635 (1976) (considering collateral consequences of a criminal conviction on mootness); *State v. Wilhite*, 2025 WI App 64, ¶1 n.1, 418 Wis. 2d 471, 27 N.W.3d 238 (considering collateral consequences of order of commitment of person found not guilty by reason of mental disease or defect on mootness).

¶10 A person under a protective placement pursuant to WIS. STAT. § 55.12 "shall be liable for the cost of the care, maintenance, services and supplies." WIS. STAT. § 46.10(2). Thus, by statute, Robert is liable for

---

[5] The County concedes that Robert is liable for the reasonable fees of the court-appointed guardian and his own counsel, if his income or assets are sufficient. Robert does not rely on the order requiring him to pay the attorneys' fees as a collateral consequence of the order extending the protective placement order. Nor do we. As discussed herein, we hold that Robert's liability for the costs related to protective placement under WIS. STAT. § 46.10 is a collateral consequence that renders the appeal not moot.

such costs related to his protective placement. In the context of an appeal from an order extending an involuntary civil commitment under Chapter 51, we have held that a person's mandatory liability under the same statute, WIS. STAT. § 46.10(2), for the cost of the care received during the commitment is a collateral consequence that renders an appeal non-moot, even when the commitment order has expired. *S.A.M.*, 402 Wis. 2d 379, ¶24.

¶11    The County concedes that Robert may be required to pay costs related to his care under the protective placement order, but argues that these potential costs are not a collateral consequence making the appeal non-moot. It contends that WIS. STAT. § 55.045 provides the legal basis for the County to seek reimbursement for the costs of care from Robert, and that the imposition of costs under that provision is not mandatory.

¶12    Section 55.045 requires a county, within certain funding limitations, to provide for the "reasonable program needs" of individuals who are provided protective placement. It further provides that a county "may require that an individual who is provided protective placement . . . under this chapter provide reimbursement for services or care and custody received, based on the ability of the individual to pay for such costs." The County argues that because this provision states only that a county "may" seek such reimbursement, it does not create mandatory liability as a collateral consequence of the protective placement order. We rejected a similar argument in *S.A.M.*, holding that "it is irrelevant whether collection efforts have begun because, regardless, [the individual] remains liable solely by virtue of § 46.10(2)'s mandatory language ('shall be liable'). And . . . it is enough to overcome mootness when there is the 'potential' for collection actions because of the liability." 402 Wis. 2d 379, ¶25. The same is true here. Although § 55.045 grants a county discretion to seek reimbursement for costs from an individual under protective placement, § 46.10(2) grants no discretion to the individual to pay those costs. Moreover, at the hearing to continue the protective placement order, Robert's guardian, in explaining why she sought an order for the sale of Robert's house, advised the court that Robert was, in fact, being assessed a "cost share" for his care.

¶13    The financial consequences to Robert of the order continuing protective placement in 2024 did not disappear when the court ordered the continuation of protective placement in 2025. Robert is "liable for the cost of the care, maintenance, services and supplies" under WIS. STAT.

§ 46.10(2), including the costs of his care incurred while the 2024 order was in effect. Over Robert's objection, his home was sold to generate assets to cover those costs, in part. Robert's liability for the costs related to his protective placement is a collateral consequence of the order extending the protective placement. We hold that his appeal is not moot and we proceed with our analysis of the merits.

### B. STANDARD OF REVIEW

¶14     We next address the appellate standard of review of the sufficiency of the evidence to support a circuit court's order of protective placement under WIS. STAT. § 55.08.

¶15     Appellate review of the sufficiency of the evidence to support a protective placement order presents a mixed question of fact and law. *See Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. Appellate courts uphold a circuit court's factual findings unless they are clearly erroneous, and we review de novo the sufficiency of the evidence to meet the requirements for continued protective placement. *See id.*; WIS. STAT. § 805.17(2); *Coston v. Joseph P.*, 222 Wis. 2d 1, 22–23, 586 N.W.2d 52 (Ct. App. 1998). A circuit court's findings of fact are not clearly erroneous unless "the finding is against the great weight and clear preponderance of the evidence." *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶12, 290 Wis. 2d 264, 714 N.W.2d 530.[6]

### C. SUFFICIENCY OF THE EVIDENCE

¶16     Applying the mixed standard of review to Robert's appeal, we uphold the circuit court's factual findings as not clearly erroneous and conclude that the record contains sufficient evidence to meet the legal

---

[6] The Wisconsin Counties Association's amicus brief advocates that we adopt a "clear error" standard of review when reviewing protective placement determinations. This court has not previously addressed the standard of review of the sufficiency of the evidence to support a Chapter 55 protective placement. The parties themselves agree that the mixed standard of review discussed herein applies, in accordance with court of appeals' precedent, and do not ask this court to adopt the "clear error" standard. Thus, we apply the mixed standard of review and decline to take up the amicus' proposal to abandon it in favor of the "clear error" standard.

requirements for continued protective placement under WIS. STAT. § 55.08.[7]

¶17 An order for protective placement requires a County to prove by clear and convincing evidence that an individual: (1) "has a primary need for residential care and custody"; (2) "has been determined to be incompetent by a circuit court"; (3) "is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others" due to "developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities"; and (4) "has a disability that is permanent or likely to be permanent." WIS. STAT. § 55.08(1)(a)–(d); *see also Fond du Lac County v. Helen E.F.*, 2012 WI 50, ¶14, 340 Wis. 2d 500, 814 N.W.2d 179. To order the continuation of a protective placement, a circuit court must find by clear and convincing evidence that the individual

---

[7] In her dissent, Justice Protasiewicz contends that this court did not faithfully apply the mixed standard of review applicable to protective placement appeals. *See* Justice Protasiewicz's dissent, ¶108. Her dissent discusses the two-pronged standard at length and claims that the majority did not conduct a meaningful de novo review of the sufficiency of the evidence in this case. *See id.*, ¶88. As demonstrated in the following section, we faithfully apply the mixed standard of review. We uphold the circuit court's findings of fact and conclude that the record contained sufficient evidence to establish that Robert continued to meet the standards for dangerousness and permanence required by WIS. STAT. § 55.08. *See infra* ¶¶17–29. We acknowledge that, as Justice Hagedorn notes in his concurrence, "the [legal] determination is fundamentally factual." Justice Hagedorn's concurrence, ¶50. In his view, "there's nothing left to do" after we determine what facts were found by the circuit court and determine that the factual findings were not clearly erroneous. *See id.* Justice Hagedorn astutely explains how the lines between the review of factual findings and legal determinations are blurred when statutory requirements rest on factual determinations, as they do here. *See id.*, ¶¶42–49. In such situations, he contends, the mixed standard of review is collapsed. *See id.*, ¶¶44–49 (citing this court's decisions in *State v. Garfoot*, 207 Wis. 2d 214, 225, 558 N.W.2d 626 (1997) and *State v. J.D.B.*, 2026 WI 5, ¶3, 419 Wis. 2d 383, 31 N.W.3d 314). Justice Hagedorn makes a compelling case for this court to consider adopting a clearly erroneous standard of review for Chapter 55 protective placement orders. *See id.*, ¶¶50–53. Nevertheless, we leave that issue for another day and apply the mixed standard here, recognizing that the statutory requirements for protective placement at issue in this case are fact intensive.

continues to meet these standards and that the placement is the least restrictive consistent with the individual's needs. *See* WIS. STAT. § 55.18(3)(e)1.

¶18     Robert argues that the County failed to prove he qualified for protective placement, challenging the circuit court's findings regarding the third and fourth standards under § 55.08(1)(c)–(d). Robert first argues that the County needed to prove more than the existence of a disability or vague concerns for his well-being to meet its burden of proving that he presents a substantial risk of serious harm to himself or others. Robert also argues that the evidence was insufficient to support a finding that his disability is permanent or likely to be permanent, given Dr. Braam's testimony regarding the "possibility" that Robert "has the ability to regain some of his cognitive abilities." The County, on the other hand, maintains that it presented clear and convincing proof as to both elements and that the record contains sufficient evidence to support the circuit court's order continuing Robert's 2024 protective placement.

¶19     Under § 55.08(1)(c), the County must show that the "risk of serious harm" from Robert's incapacities is "substantial." *See K.N.K. v. Buhler*, 139 Wis. 2d 190, 202, 407 N.W.2d 281 (Ct. App. 1987). This means "[t]he harm envisioned may not be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual." *Id.* However, "the statute does not require that dangerousness be proven by recent acts or omissions." *Id.* at 203 (emphasis omitted).

¶20     The circuit court credited and gave weight to Dr. Braam's hearing testimony and professional opinions. Dr. Braam testified that Robert was diagnosed with a neurocognitive disorder due to a cerebrovascular accident (a stroke or similar incident), right-side hemiparesis, and expressive aphasia, incapacitating him both physically and mentally and causing him to have difficulty communicating. He described Robert's speech and language impairment as "severe."

¶21     Dr. Braam testified that Robert's functional knowledge is diminished, describing him as "marginally aware of . . . what was going on." He described Robert's orientation as "mildly impaired," commenting that he was "off on the dates" and "not really able to have much of a discussion about current events." He testified that Robert's attention and concentration are mildly impaired and that he has mild to moderate memory impairment. Dr. Braam testified that Robert's "most concerning" cognitive impairments related to his executive functioning, describing him

8

as having "difficulties with higher level thinking to be able to make decisions, informed decisions," and as "overestimating" his own abilities.

¶22    Dr. Braam offered his professional opinions regarding how Robert's incapacities affected his capability to care for himself. He explained that Robert's impaired critical thinking skills interfered with his ability to "protect himself from financial abuse and protect his health and safety." He testified that, in his opinion, Robert required 24-hour supervision and monitoring "due to [his] need for assistance with activities of daily living, food preparation, transportation and organization of the transportation to medical appointments," to name "just a few things." He expressed the opinion that Robert needed assistance in remembering to take his medications in proper doses, due to his cognitive impairments. Dr. Braam acknowledged that Robert is prescribed a large number of medications.

¶23    The circuit court made factual findings regarding Robert's physical and cognitive impairments and his needs related to his care and custody based on Dr. Braam's largely uncontested testimony. These findings included that Robert suffered from a neurocognitive disorder, expressive aphasia, and hemiparesis. The court specifically credited and adopted Dr. Braam's opinions that Robert's critical thinking skills were impaired to the point that he is unable to make competent decisions related to his care and custody. The circuit court also found that Robert's incapacities left him unable to provide for his own care, including taking medication, bathing, obtaining proper food, and planning for and coordinating proper medical treatment, again crediting Dr. Braam's testimony regarding these limitations.[8]

_____

[8] We note that Justice Protasiewicz's dissent largely disregards these specific factual findings, instead critiquing the lack of detail and inconsistencies in the evidence presented by the County. For example, her dissent dissects Dr. Braam's testimony that Robert required assistance in taking his medication, complaining that Dr. Braam did not "identify any of the medications Robert was taking, the dosage and frequency of each, the illnesses or conditions for which they were prescribed, or how Robert's mental or physical condition might be effected if he did not take them as prescribed." Justice Protasiewicz's dissent, ¶98. The circuit court, by contrast, was satisfied that Dr. Braam's testimony showed that Robert, while compliant in taking his medications, needs assistance in remembering to take them in the correct doses and at the proper times. At bottom, Justice Protasiewicz's conclusions related to both dangerousness and permanency rest on a rejection of the circuit court's factual findings. Because we

¶24   Because these findings of fact are not against the great weight and clear preponderance of the evidence, we uphold them under the clearly erroneous standard of review and accept them as true. Our de novo review requires us to determine whether, in light of the established facts regarding Robert's impairments and their profound effects on his ability to care for himself, the legal standard of dangerousness was met. We conclude that the evidence was sufficient to establish, under the clear and convincing standard, that Robert's incapacities left him so incapable of providing for his own care or custody that he presented a danger to himself or others.

¶25   Robert also challenges the sufficiency of the evidence that his disability is permanent or likely to be permanent, as required by WIS. STAT. § 55.08(1)(d), largely because Dr. Braam conceded it was difficult to predict the extent to which Robert's disability is permanent.

¶26   Dr. Braam acknowledged that Robert's ability to communicate could potentially improve with therapy. He testified that communication training and use of assistive communication devices could be "extremely helpful" and "reduce his needs for guardianship." On the other hand, he stated that such therapy would take time to learn and would reduce Robert's needs for assistance only if it was effective and improved his communication skills. Dr. Braam also conceded that it was difficult to assess the extent and permanency of Robert's cognitive impairments due to his limited ability to communicate. In addition to recommending speech therapy, he testified that a neuropsychological evaluation would provide a more complete picture of Robert's cognitive defects and the potential for improvement. He testified, however, that in his opinion, other interventions would not eliminate the need for a guardianship.

¶27   In making its factual findings, the circuit court discussed the inconsistencies and reservations in Dr. Braam's testimony regarding the permanency of Robert's disability. It placed more weight on Dr. Braam's

---

believe the circuit court's factual findings are not clearly erroneous, we rely on and apply them in determining de novo that the evidence was sufficient to meet the legal requirements that Robert presents a danger to himself or others and has a disability that is permanent.

testimony regarding the extent to which Robert's incapacities left him in need of assistance with activities of daily living. The circuit court found that, even if Robert's communication were improved with therapy, the cumulative effect of his disabilities on his functioning would leave him unable to provide for his own care and custody.[9]

¶28 "It is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Barney by Lowe v. Mickelson*, 2020 WI 40, ¶32, 391 Wis. 2d 212, 942 N.W.2d 891 (citation modified). The circuit court, acting as fact finder, "is the ultimate arbiter of the credibility of witnesses and a reviewing court will accept the inference drawn by the trier of fact." *Groshek v. Trewin*, 2010 WI 51, ¶11, 325 Wis. 2d 250, 784 N.W.2d 163 (citation modified).

¶29 Although Dr. Braam's testimony suggests that Robert's communication abilities could be improved with appropriate therapy, the circuit court resolved the competing inferences relating to the permanency of Robert's disability by giving greater weight to Dr. Braam's testimony about Robert's other impairments. The circuit court reasonably inferred that even if Robert's communication improved, his other impairments— cognitive and physical—would cause him to continue to need assistance with both daily living activities and complex tasks such as organizing his medical care. The circuit court further inferred from Dr. Braam's testimony that no other intervention could potentially mitigate Robert's other physical and cognitive impairments. We accept the circuit court's reasonable inferences and uphold its findings of fact as not contrary to the great weight and clear preponderance of the evidence. In light of those factual findings, we conclude in our de novo review that the evidence was

---

[9] Justice Bradley accuses the County of "stalling" Robert's recovery by failing to offer him speech therapy or a neuropsychological evaluation. *See* Justice Bradley's dissent, ¶72. The initial order for protective placement did not order the County to provide those services. At the hearing on the continuation of the protective placement, Robert's guardian ad litem, his attorney, and the County's attorney jointly requested that the court order speech and language therapy, but none requested an order for a neuropsychological examination. Robert's attorney conceded that she was "not sure" Robert would agree to a neuropsychological evaluation. Accordingly, the circuit court ordered speech and language therapy, but declined to order a psychological evaluation.

sufficient to support the circuit court's finding that Robert's disability is permanent or likely to be permanent.

## III. CONCLUSION

¶30    Chapter 55 of the Wisconsin Statutes "is designed to establish [] protective services and protective placements, to assure their availability to all individuals when in need of them, and to place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, financial exploitation, neglect, and self-neglect." WIS. STAT. § 55.001. Robert's appeal of the order continuing protective placement is not moot given his potential financial liability, including the costs related to his protective placement. In our de novo review, we hold that the record contains sufficient evidence to establish that Robert's disability continued to create a substantial risk of serious harm to himself or others and that his disability was permanent or likely to be permanent. Accordingly, we uphold the circuit court's order continuing the protective placement.

*By the Court.*—The decision of the court of appeals is affirmed.

BRIAN K. HAGEDORN, J., with whom SUSAN M. CRAWFORD, J., joins, concurring.

¶31    The opinion for the court correctly explains and applies the law as it now stands. I join it in full. In the course of briefing, the Wisconsin Counties Association, appearing as amicus curiae, urged this court to reconsider the standard of appellate review that should govern in Chapter 55 cases. This issue was not raised by the parties, and addressing it was unnecessary to resolve the dispute before us. However, this suggestion has considerable merit. I therefore write separately to explain why this court should reexamine this issue in a future case.

## I.  STANDARDS OF REVIEW GENERALLY

¶32    The standard of review in a case operates as a decisional framework for reviewing the work of lower courts and other state actors. It is, at root, an exercise in apportioning power and responsibility among decisionmakers. *State v. J.D.B.*, 2026 WI 5, ¶15, 419 Wis. 2d 383, 31 N.W.3d 314. The standard of review is a legal question, and it may be set by the legislature or an appellate court. For example, in review of administrative proceedings, the legislature provides that an agency's determination of fact is accorded substantial deference, while an agency's interpretation of law is reviewed de novo. WIS. STAT. § 227.57(6), (11).[1] But when neither the legislature nor the United States Supreme Court mandate a specific standard of review, it is incumbent upon this court or the court of appeals to determine which standard of review should govern. *See J.D.B.*, 419 Wis. 2d 383, ¶19.

¶33    At the outset, establishing the proper standard of review requires an examination of the type of issue being reviewed. Ronald R. Hofer, *Standards of Review-Looking Beyond the Labels*, 74 MARQ. L. REV. 231, 233 (1991). Generally speaking, decisions fall into three categories: discretion, fact, or law. *J.D.B.*, 419 Wis. 2d 383, ¶15. With this in view, the court then examines more fundamental questions, including "which court

---

[1] WISCONSIN STAT. § 227.57(11) codified our decision in *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, 382 Wis. 2d 496, 914 N.W.2d 21.

is better positioned to decide the question as a final matter" and "whether uniformity or flexibility is important in the rule's application." *Id.*, ¶19.

¶34 In some matters, the law is designed to afford flexibility to lower courts. These are matters of judgment where the law provides guidance and boundaries, but otherwise grants the decisionmaker discretion to determine the best course of action. For example, evidentiary rules grant trial courts discretion to determine whether evidence is relevant or prejudicial. *State v. Johnson*, 2021 WI 61, ¶33, 397 Wis. 2d 633, 961 N.W.2d 18. Similarly, the law entrusts circuit courts with broad discretion in sentencing those found guilty of crimes. *State v. Gallion*, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197. In handing down a sentence, circuit court judges are both empowered and encouraged to determine what justice requires. This decision comes with first-hand observation of the criminal defendant, the victim, and others impacted by the crime. The proper sentence relies peculiarly on the personal knowledge and judgment of the circuit court judge. *Id.*, ¶18. In this circumstance, and others like it, courts review such decisions for an erroneous exercise of discretion. Under this standard, we affirm a court's exercise of discretion as long as it is a decision a reasonable judge could make within the bounds of the governing law. *Gudex v. Franklin Collection Service, Inc.*, 2026 WI 6, ¶8, 419 Wis. 2d 534, 31 N.W.3d 338.

¶35 Other decisions are questions of fact. These go to the fundamental question of what happened and which witnesses or evidence are credible. Factual questions often require judgment as well—the judgment to decide who is telling the truth and who is not, or for example, to decide who offers a more convincing explanation of a person's medical situation. Trial courts are uniquely designed to decide these questions. "Determining what is true as a factual matter involves evaluating witnesses and evidence and otherwise making numerous credibility judgments based on both written and in-person evidence." *J.D.B.*, 419 Wis. 2d 383, ¶16. Appellate courts, in contrast, "review only a cold paper record." *Id.*, ¶17. We are simply not institutionally competent to find facts in the ordinary course. As such, the general rule is that we accept the trial court's factual findings unless they are clearly erroneous. *Id.*, ¶18. Under this standard, "a circuit court's finding of fact is not clearly erroneous unless it is against the great weight and clear preponderance of the evidence, even if the evidence may have presented competing factual

inferences." *State v. Wiskerchen*, 2019 WI 1, ¶30, 385 Wis. 2d 120, 921 N.W.2d 730.

¶36 Finally, some decisions are questions of law. While circuit courts must determine what law to apply to the issues in a case, they are no better equipped to do so than appellate courts. Appellate courts are intentionally structured "to deliberate and decide what the law is— matters determined by reference to legal authorities such as statutes, constitutions, and precedent." *See J.D.B.*, 419 Wis. 2d 383, ¶17. This is why we independently review questions of law, without affording deference to the legal determination below. *See id.*, ¶18.

¶37 These three buckets make sense in theory. In practice, however, the lines between the buckets are often blurred. That brings us to the standard of review in ch. 55.

## II. THE STANDARD OF REVIEW AND CHAPTER 55

¶38 Before a person can be put into protective placement under ch. 55, the county must meet its threshold burden of proof. *Walworth County v. Therese B.*, 2003 WI App 223, ¶7 n.3, 267 Wis. 2d 310, 671 N.W.2d 377. The county must prove that four specific requirements are met by clear and convincing evidence:

(1) PROTECTIVE PLACEMENT. A court may under s. 55.12 order protective placement for an individual who meets all of the following standards:

(a) The individual has a primary need for residential care and custody.

(b) The individual is a minor who is not alleged to have a developmental disability and on whose behalf a petition for guardianship has been submitted, or is an adult who has been determined to be incompetent by a circuit court.

(c) As a result of developmental disability, degenerative brain disorder, serious and persistent

> mental illness, or other like incapacities, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others. Serious harm may be evidenced by overt acts or acts of omission.
>
> (d) The individual has a disability that is permanent or likely to be permanent.

WIS. STAT. § 55.08(1)(a)–(d); *K.N.K. v. Buhler*, 139 Wis. 2d 190, 197, 407 N.W.2d 281 (Ct. App. 1987).

¶39　This section, then, establishes a legal standard that must be met. Yet each of the four required "legal" findings, at bottom, are questions of medical or procedural fact. Paragraph (a) asks whether an individual has a "primary need" for certain medical care. Paragraph (b) is an inquiry into procedural prerequisites. Paragraph (c) articulates the criteria of dangerousness—i.e., the person is so unable to take care of themselves that they risk harming themselves or others. And para. (d) requires a court to conclude the disability is, or is likely to be, permanent. Other than para. (b), each of the other findings will depend heavily, if not entirely, on a factfinder's assessment of the medical evidence. It will likely require sifting through competing inferences, dueling expert reports, and otherwise assessing the credibility of expert reports and testimony.

¶40　This makes the standard of review question difficult. On the one hand, these are statutory requirements—legal standards that must be satisfied. On the other hand, these findings are essentially a series of factual determinations. Wisconsin courts have addressed this kind of situation in other contexts, but we have done so in ways that are arguably inconsistent, heightening the need for reexamination.

¶41　In *State v. Garfoot*, we were tasked with deciding the standard of review for cases under WIS. STAT. § 971.14—which concern a defendant's competency to stand for trial. 207 Wis. 2d 214, 216–17, 221–22, 558 N.W.2d 626 (1997). Rooted in United States Supreme Court precedent and WIS. STAT. § 971.13(1), the test for competency requires the court to determine whether a person "possesses sufficient present ability to consult

4

with his or her lawyer with a reasonable degree of rational understanding," and that "he or she possesses a rational as well as factual understanding of a proceeding against him or her." *Id.* at 222.

¶42 We recognized that although this was a legal test, "its determination is functionally a factual one: either the state has convinced the court that the defendant has the skills and abilities to be considered 'competent,' or it has not." *Id.* at 222–23. Given its "superior ability to observe the defendant and the other evidence," we concluded that the trial court was best positioned to make this ultimate determination. *Id.* at 223. Recognizing that the determination was "primarily factual," we concluded that the clearly erroneous standard should govern review of a trial court's competency determination. *Id.* at 225.

¶43 Most recently, this court took the same approach in *J.D.B.* That case concerned the involuntary administration of psychotropic medication to render a defendant competent for trial. One of the questions we addressed was what standard of appellate review should govern four findings required by the Supreme Court—namely, that (1) "important governmental interests are at stake"; (2) "involuntary medication will significantly further" those interests; (3) "involuntary medication is necessary to further those interests"; and (4) "administration of the drugs is medically appropriate." *Sell v. United States*, 539 U.S. 166, 180–81 (2003); *J.D.B.*, 419 Wis. 2d 383, ¶1.

¶44 Following the near-universal conclusions of our sister courts, we held that the first *Sell* factor should be reviewed de novo, but the remaining three *Sell* factors were primarily fact questions and should "not be disturbed unless they are clearly erroneous." *J.D.B.*, 419 Wis. 2d 383, ¶3. We explained that circuit courts were uniquely equipped and institutionally competent to make what were essentially medical determinations based on the evidence. *Id.*, ¶¶16, 34, 40, 43. The second *Sell* factor, for example, "is all about the efficacy of the medicine"—a "factual determination" of "how likely a given treatment plan is to help, and not to harm the defendant." *Id.*, ¶¶30, 34. The third *Sell* factor requires the court to "determine that treatments other than medication and methods of administering medication less intrusive than involuntary medication . . . are not available." *Id.*, ¶39. Once again, "this finding is predominantly a medical conclusion, not a legal one." *Id.*, ¶40. And the

fourth *Sell* factor requires that "administration of the drugs is medically appropriate, i.e., in the patient's best medical interest in light of his medical condition." *Id.*, ¶42 (citation modified). Yet again, the patient's best medical interest is "predominantly a factual question that appellate courts are not well-positioned to second guess." *Id.*, ¶43.

¶45     Thus, in *Garfoot* and *J.D.B.*, this court recognized that certain medical questions were best understood as factual determinations, even when those conclusions were coextensive with the legal standard. And we treated them like we treat other factual determinations—accepting the trial court's findings unless clearly erroneous.

¶46     Based on my research, this court has never considered the standard of review in ch. 55 cases. Thus, should such an issue come to us, it would be an issue of first impression in our court. Meanwhile, the court of appeals adopted and has been applying what is called a mixed standard of review in ch. 55 cases. *See Therese B.*, 267 Wis. 2d 310, ¶21. Under this approach, factual findings are upheld unless they are clearly erroneous, and the ultimate determination of whether the evidence supports protective placement is reviewed de novo as a question of law. *Id.*

¶47     This mixed standard of review works well in many contexts. For example, in a negligence case, the factual inquiry—what the person did—is reviewed under the clearly erroneous standard. The legal inquiry—what a reasonable person should have done—is reviewed de novo. *See* Michael S. Heffernan, *Appellate Practice and Procedure in Wisconsin*, § C-29 (10th ed. 2025) (discussing *Millonig v. Bakken*, 112 Wis. 2d 445, 450, 334 N.W.2d 80 (1983)). The same is true for a Fourth Amendment *Terry* stop. The facts of what happened—the nature of the stop, what was seen or heard, etc.—are factual determinations. *State v. Genous*, 2021 WI 50, ¶10, 397 Wis. 2d 293, 961 N.W.2d 41. But whether the stop satisfies the applicable constitutional standard is an independent legal question. *Id.* In these types of cases, the questions of fact and law are readily distinguishable and can easily be reviewed under different standards.

¶48     The legal prerequisites for protective placement in WIS. STAT. § 55.08, however, look entirely different. Does a person have a "primary need" for care (para. (a))? Is the individual dangerous (para. (c))? Is the

disability of a permanent character (para. (d))? Suppose a trial court hears competing testimony, reviews opposing expert reports, and ultimately makes a factual determination that an individual meets the requirement that he is dangerous to himself or others. What, exactly, does it mean to say that we uphold this factual determination unless clearly erroneous, but determine de novo whether it satisfies the legal standard for dangerousness? If the trial court determines he is, as a factual matter, dangerous under the statutory definition, then of course the statutory criterion of dangerousness has been satisfied. The legal and factual questions are fundamentally the same. They collapse into a single determination of fact.

¶49     Justice Crawford drew this out in oral argument, asking Robert's counsel why the factfinder can't "pick and choose among the evidence that's presented. Isn't that part of the trial court's job in a case like this, to resolve conflicts in the evidence?"[2] Indeed. There may have been some evidence suggesting dangerousness and some suggesting the opposite. The trial court weighed the evidence and came to a conclusion as the factfinder. Why should we, as an appellate court, second-guess the reasonable inferences and credibility determinations of the factfinder? We are far less suited than the circuit court to determine Robert's dangerousness.

¶50     Our case today further exposes the problem. The majority faithfully applies the mixed standard of review adopted by the court of appeals and not contested by the parties. Majority op., ¶¶16–29. Starting with dangerousness, the majority evaluates the trial court's factual findings in depth, concluding that they are not clearly erroneous. *Id.,* ¶¶18–23. After multiple paragraphs of examining the facts, the majority concludes: "in light of the established facts . . . We conclude . . . Robert's incapacities left him so incapable of providing for his own care or custody that he presented a danger to himself or others." *Id.,* ¶24. The same sort of approach governs the court's decision on the permanency challenge. *Id.,* ¶¶25–29. Analytically, our de novo review of the legal question is doing

---

[2] Oral argument at 16:28–16:59, *Racine County v. R.P.L.,* 2025AP813-FT, https://wiseye.org/2026/03/10/wisconsin-supreme-court-racine-county-v-r-p-l/ (last visited June 29, 2026).

no real work. Why? Because there's nothing left to do; the determination is fundamentally factual. To be clear, this is not a problem with the majority's analysis; it is sound, and I join it. The issue lies with the standard of review itself which tries to separate an inseparable question.

¶51     In addition, adopting a clearly erroneous standard of review would place us in good company. Federal commitments with similarities to our ch. 55 cases already use the clear error standard of review that the Wisconsin Counties Association suggests we adopt. For example, "A district court's decision to commit an incarcerated person whose sentence is expiring under 18 U.S.C. § 4246 is necessarily factbound and, thus, review is for clear error." *United States v. Anonymous Appellant*, 85 F.4th 576, 579 (1st Cir. 2023); *see also United States v. Williams*, 299 F.3d 673, 676–77 (8th Cir. 2002). Under a different federal law, federal courts have held that a commitment based on a finding of dangerousness "under § 4243(e) is a finding of fact that can be reversed only if clearly erroneous." *United States v. Stewart*, 452 F.3d 266, 273–74 (3d Cir. 2006) (collecting cases); *United States v. Gilgert*, 314 F.3d 506, 513 (10th Cir. 2002).

¶52     In her dissent, Justice Protasiewicz defends the mixed standard of review. She does so in part because she reads the evidence differently, finding it insufficient, and in part because of the important liberty interests at stake. But the strength of the liberty interest does not necessarily determine the proper standard of review. In *J.D.B.*, decided just this term, we applied the clearly erroneous standard of review to legal standards for when the state may involuntarily medicate someone—an issue that surely raises important liberty interests. Thus, the question is not whether the interest is important; the question is still who is in the best position to decide. Justice Rebecca Grassl Bradley, in her dissent, likewise critiques the majority for failing to do a proper de novo review. But the dissents of both Justice Bradley and Justice Protasiewicz express disagreement not with whether the legal standards were satisfied per se, but with whether the circuit court's findings were the best read of the evidence. In other words, both dissents fall prey to the very problem this concurrence addresses: second-guessing the circuit court's factual findings. To be sure, their read of the evidence is plausible, but so is the circuit court's. And since the circuit court is in the better position to make the ultimate factual determination, we should not disturb its findings here, even if reasonable judges might disagree.

¶53     In sum, there is a strong argument that the standards in WIS. STAT. § 55.08 are medically-rooted, credibility-reliant, factual inquiries. If so, as in *Garfoot*, *J.D.B.*, and analogous federal cases, perhaps this court should apply the same clearly erroneous standard of review to these predominantly factual questions.[3] At the very least, the issue deserves further examination in a future case.

---

[3] Chapter 51 cases are also reviewed using this mixed standard of review. *See Marathon County v. D.K.*, 2020 WI 8, ¶18, 390 Wis. 2d 50, 937 N.W.2d 901. This approach, however, has also caused problems in ch. 51 cases when trial courts do not make sufficiently clear factual findings. *See, e.g., Langlade County v. D.J.W.*, 2020 WI 41, ¶¶40–47, 391 Wis. 2d 231, 942 N.W.2d 277. For the same reasons I suggest revisiting the standard of review in ch. 55 cases, revisiting our standard of review in ch. 51 cases may also be appropriate.

REBECCA GRASSL BRADLEY, J., dissenting.

¶54    "Of all tyrannies a tyranny sincerely exercised for the good of its victims may be the most oppressive. . . . [T]hose who torment us for our own good will torment us without end for they do so with the approval of their own conscience. They may be more likely to go to Heaven yet at the same time likelier to make a Hell of earth." C.S. LEWIS, GOD IN THE DOCK: ESSAYS ON THEOLOGY AND ETHICS 292 (Walter Hooper ed., 1970).

¶55    Three years ago, Robert[1] was admitted to the hospital after a Meals on Wheels delivery driver found him on the floor of his home. Robert had fallen in the shower. He was 65 years old at the time. The hospital filed a petition for the appointment of a guardian and for a protective placement order, which the circuit court granted. Without his consent, the State has permanently removed Robert from his home of forty years, confined him to an "adult family home"[2] ("AFH"), and forced the sale of his actual home to finance an out-of-home placement Robert does not want.

¶56    If the law permitted the State to torment Robert for his own good, this court would have no basis to intervene. The State, however, never cleared the statutory hurdles justifying a protective placement. The majority says Robert cannot go home because his disability is permanent or likely to be permanent and creates "a substantial risk of serious harm to himself or others." Majority op., ¶30. The record does not support the majority's conclusions. Most glaringly, Racine County ("the County")

---

[1] "Robert" is a pseudonym used to protect his privacy.

[2] Under WIS. STAT. § 50.01(1), "Adult family home" means either "[a] private residence" licensed to provide "[c]are and maintenance above the level of room and board but not including nursing care . . . for 3 or 4 adults" or "[a] place where 3 or 4 adults who are not related to the operator reside and receive care, treatment or services that are above the level of room and board and that may include up to 7 hours per week of nursing care per resident." In Robert's case, "adult family home" is a misnomer; nothing in the record suggests that any of Robert's family resides there and Robert does not consider the AFH to be his home.

failed to prove the permanency of Robert's disability, a prerequisite to the continuation of a protective placement.

¶57 Paying only lip service to its duty to conduct a de novo review, the majority rubberstamps the lower courts' conclusions that the County's evidence satisfies the statutory basis for continuing Robert's protective placement. The County's evidence fell short. Depriving Robert of a meaningful appellate review, the majority consigns Robert to a protective placement "indefinite in duration" and "tantamount to a life sentence to a nursing home or other custodial setting." *Jefferson County v. Joseph S.*, 2010 WI App 160, ¶13, 330 Wis. 2d 737, 795 N.W.2d 450 (quoting *Walworth County v. Therese B.*, 2003 WI App 223, ¶12, 267 Wis. 2d 310, 671 N.W.2d 377). While undoubtedly easier on the County to place Robert in out-of-home care rather than arrange for services in his own home, the law requires the State to "place the least possible restriction on personal liberty." WIS. STAT. §§ 55.001, 55.12(3). The court-appointed expert identified multiple evaluations, trainings, and therapies, which if provided to Robert, could improve his condition to the point of regaining competency. The County never offered any of them to Robert, so he will remain in out-of-home care, against his will. Every person's nightmare has come true for Robert.

I

¶58 Before a court may order a protective placement, the court must determine the individual (1) "has a primary need for residential care and custody"; (2) "is an adult who has been determined to be incompetent by a circuit court"; (3) "is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself . . . or others" due to a "developmental disability, degenerative brain disorder, serious and persistent mental illness, or other like incapacities";[3] and (4) "has a disability that is permanent or likely to be permanent." WIS. STAT. § 55.08. An order for protective placement is appropriate only when the court or a jury "find[s] by clear and convincing

---

[3] Under WIS. STAT. § 55.01(5), "'[o]ther like incapacities' means those conditions incurred at any age which are the result of accident, organic brain damage, mental or physical disability or continued consumption or absorption of substances, producing a condition which substantially impairs an individual from adequately providing for his or her care or custody."

evidence that the individual to be protected is in need of protective placement because he or she meets all of the standards under s. 55.08 (1)." WIS. STAT. § 55.10(4)(d); *Fond du Lac County v. Helen E.F.*, 2012 WI 50, ¶17, 340 Wis. 2d 500, 814 N.W.2d 179. A circuit court "must expressly make independent factual findings on the record, separate from any legal conclusions." *Marathon County v. D.K.*, 2020 WI 8, ¶68 n.4, 390 Wis. 2d 50, 937 N.W.2d 901 (Rebecca Grassl Bradley, J., concurring). Testimony that merely recites the legal conclusion is insufficient to support the circuit court's ruling. *See id.*

¶59 Upon determining a protective placement is appropriate, the court should "place the least possible restriction on personal liberty and exercise of constitutional rights consistent with due process and protection from abuse, financial exploitation, neglect, and self-neglect." WIS. STAT. § 55.001. Under WIS. STAT. § 55.12(2), a protective placement can be an individual's own home, although typically a court orders protective services if a person will remain in his home. "Protective placement or protective services provided by a county department or an agency with which it contracts . . . shall be provided in the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department." WIS. STAT. § 55.12(3).

¶60 At the time Robert went to the hospital in 2023, he had a major neurocognitive disorder that interfered with his ability to speak, his orientation, and his executive functioning. Robert also had hemiparesis—muscle weakness or paralysis—on his right side. Robert's medical issues stem, at least in part, from a prior stroke and gunshot wound. Medical professionals at the hospital ultimately ruled out a stroke but determined Robert was dehydrated, had abnormal blood pressure, and had a significant decline in his speech and language abilities. After an extended hospitalization, the hospital petitioned for a protective placement order, which the circuit court granted.

¶61 A year later, the County filed a petition for the statutorily required annual review of Robert's protective placement. Robert challenged his protective placement. During the review hearing, the County presented only the testimony of the court-appointed expert, Dr. Steven J. Braam, a licensed psychologist. Dr. Braam conceded it was "a bit of a tricky thing to be able to get accurate information" from Robert during his examination because Robert suffered from aphasia, "which prevents him from being able to express his thoughts into words." Dr.

Braam concluded Robert remained paralyzed on his right side, had mild impairment of orientation, attention, and concentration, and had moderate impairment of reasoning, emotional behavioral functioning, and "other executive functioning." Dr. Braam also testified Robert had mild to moderate impairment of memory and severe impairment of sensory motor function and language and communication due to the aphasia and right-side paralysis.

¶62 Dr. Braam opined these impairments affected Robert's ability to live alone without a risk of harm to himself. For example, Dr. Braam testified Robert's impaired critical thinking skills interfered the most with his ability to make decisions for himself. Dr. Braam further explained that Robert's deficits interfered with his ability to protect himself from financial abuse as well as to protect his health and safety. Dr. Braam acknowledged, however, that "[w]e don't know how much of a concern [Robert's critical thinking skills] are because of the communication skills." According to Dr. Braam, Robert needs "assistance with activities of daily living, food preparation, transportation and organization of the transportation to medical appointments." Dr. Braam also expressed concern about Robert's ability to remember to take his medicine and his ability to determine what to do if he missed a dose.

¶63 When asked whether the impairments were likely to be permanent, Dr. Braam answered, "[w]e don't know that for sure" "because even though his impairment might be significant right now, there is a possibility that he has the ability to regain some of his cognitive abilities." Dr. Braam further noted that Robert "has never . . . had a neuropsychological evaluation to completely map out what his cognitive deficits are and the possibility that they might improve." Cutting against a likelihood of permanent impairment, Dr. Braam informed the circuit court, "there also appears to be some time after [Robert's] first medical event that he was able to function on his own[, which] would speak to his ability to regain some competency at this point in time." Toward that end, Dr. Braam testified that "communication training and use of assistive communication devices would be extremely helpful in being able to understand" Robert and could "reduce his needs for guardianship." Speech and language training, which the County never provided, "have the potential to vastly improve . . . [Robert's] communication abilities." According to Dr. Braam, those trainings would help assess Robert's most concerning deficits—including his critical thinking skills and memory.

¶64     Ultimately, Dr. Braam concluded he did not "know that [he] can make any prediction about" the permanency of Robert's impairments because of "fairly large gaps in information that we don't know." Dr. Braam also acknowledged that Robert had significantly improved since his initial hospitalization. Despite the absence of evidence to establish the permanency of Robert's impairments, the circuit court continued its protective order. Additionally, the court approved the sale of Robert's home to fund his placement in an AFH and because the court considered the house a financial liability.

II

¶65     Whether the County has met its burden of proof to support the extension of Robert's protective placement presents a mixed question of fact and law. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. "We uphold a circuit court's findings of fact unless they are clearly erroneous," but "[w]hether the facts satisfy the statutory standard is a question of law that we review de novo." *Id.* A proper de novo review leads to the inexorable conclusion that the County's proffered evidence fell short of meeting the statutory standard for a protective placement.[4]

---

[4] Justice Hagedorn misrepresents this dissent as "express[ing] disagreement not with whether the legal standards were satisfied per se, but with whether the circuit court's findings were the best read of the evidence." Concurrence, ¶52. Because he thinks it's wrong, Justice Hagedorn won't engage with the actual standard of appellate review: "Whether the facts satisfy the statutory standard *is a question of law that we review de novo.*" *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783 (emphasis added). Obviously, application of this standard of review requires us to consider whether the facts fulfill the legal standard. In Justice Hagedorn's view, "the legal and factual questions are fundamentally the same. They collapse into a single determination of fact." Concurrence, ¶48. This is not an accurate articulation of the law. Because he would change the role of appellate courts in these cases, Justice Hagedorn joins the majority in deferring to the circuit court's determinations—factual and legal—in total, leaving Robert and other vulnerable people without any avenue for relief.

¶66 First, the County failed to establish that Robert's disabilities rendered him so incapable of caring for himself as to create a substantial risk of harm justifying permanent removal from his home. As a preliminary matter, the County did not offer a single fact witness to testify about Robert's disabilities or how they interfere with his activities of daily living. The County presented only a single witness—the court-appointed expert, Dr. Braam—who testified that Robert "need[s] assistance with bathing, nutrition, appointment planning, and especially medication planning and initiation." As a court-appointed expert witness, Dr. Braam was never involved in treating Robert; he didn't know him personally, nor was Dr. Braam familiar with Robert's social, medical, or occupational history at all. Critically, Dr. Braam never explained why the assistance Robert needed could be provided only in a restrictive, out-of-home placement.[5]

¶67 At no point did Dr. Braam explain how Robert's disabilities were so serious as to create a substantial risk of serious harm requiring an out-of-home placement and depriving Robert of the option to return to the home he owned and in which he had lived for four decades. Although it is possible to speculate about the harm an individual with disabilities could face at home, the law requires more. "Mere speculation as to difficulties [a person] may encounter is not sufficient. Specific harm must be foreseeable to fulfill" the statutory requirement. *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 515, 275 N.W.2d 143 (Ct. App. 1979). While Dr. Braam expressed concern about Robert's inability to provide for his own nutrition, for example, he never explained why a program like Meals on Wheels would be insufficient despite Robert having obtained his meals at home through that service in the past. Likewise, the County did not offer any evidence that Robert could not receive in-home services to aid him

---

[5] The majority maintains Robert's guardian ad litem reported to the circuit court that Robert refused services or help in his home. Majority op., ¶5 n.4. No testimony supports this assertion. The guardian ad litem's report for the initial protective placement hearing in 2023 says Robert "refused in-home help" "[i]n the past." Even if true, Robert's purported refusal of services at a time when he lived independently in his own home is irrelevant. The guardian ad litem's report for his annual review—the subject of this appeal—does not mention any such refusal. The record does not establish that the State ever offered Robert the choice of returning home—conditioned on a willingness to receive in-home protective services—or remaining in an AFH and having his house sold.

with bathing, taking his medication, and scheduling and transporting Robert to his appointments. Although Robert had fallen in his home, became dehydrated, and had low blood pressure upon admission to the hospital in 2023, "minor accidents, injuries and illness are not sufficient to satisfy" the statutory requirement. *Id.*

¶68 Finally, the County offered no evidence that Robert's needs necessitated placement in a facility with 24-hour surveillance and monitored egress. The County failed to demonstrate any dangers posed by Robert's disabilities could not be addressed through protective services provided in his own home. Although the law requires protective services to be "provided in the least restrictive environment and in the least restrictive manner consistent with the needs of the individual to be protected and with the resources of the county department," there is no evidence the County ever tried to fulfill this statutory mandate. *See* WIS. STAT. § 55.12(3).

¶69 The majority does not even attempt to analyze whether the facts established that Robert was "so incapable of providing for his own care or custody that he presented a danger to himself or others" and required placement in an adult care facility. *See* Majority op., ¶24. The majority neglects to consider whether Robert's needs could be met with in-home protective services, which would "place the least possible restriction" on Robert's "personal liberty." De novo review demands an appellate court review the evidence and apply the law to the facts presented, independent of a lower court's analysis. Even if the County had established a legal basis for protective placement, the County failed to prove an AFH would "place the least possible restriction" on Robert's personal liberty. *See* WIS. STAT. § 55.001.

¶70 Even if the County had established that Robert's needs could currently be met only in an AFH, the County failed to prove that Robert's disabilities are permanent or likely to be permanent. When asked whether Robert's impairments were likely to be permanent, Dr. Braam responded, "that's the difficult question because even though his impairment might be significant right now, there is a possibility that he has the ability to regain some of his cognitive abilities. We don't know that for sure." Although in his report Dr. Braam checked a box indicating Robert's "incapacity" was permanent, Dr. Braam added the following narrative: "It is unclear [to Dr. Braam] that a thorough understanding of [Robert's] condition exists[,]" and "[u]ntil there is a way to fully understand his thoughts, *it will not be possible to determine* if he has the potential to regain

competency. Given the claim that he regained significant functioning following the initial [stroke] suggests that there is potential for such improvement to occur again." (emphasis added). Dr. Braam's testimony also emphasized the importance of a "neuropsychological evaluation to completely map out what his cognitive deficits are and the possibility that they might improve," without which Dr. Braam testified, "*I don't know that I can make any prediction* about" the permanency of Robert's impairment. (emphasis added).

¶71    As a whole, plenty of evidence indicated that Robert's impairments may not be permanent. Robert demonstrated in the past an ability to regain independent functioning on his own based on his recovery from a stroke. As of the hearing date, Robert had already improved since his hospitalization after falling, having regained "some degrees of relative independence" according to Dr. Braam. Robert's history of recovery coupled with his recent improvements suggest his impairment may not be permanent, especially if Robert were given proper treatment.

¶72    The evidence suggests the County and Robert's guardian ad litem effectively stalled Robert's ability to recover by failing to offer services designed to restore his independence.[6] Although Dr. Braam testified that speech and language training could reduce Robert's need for guardianship and protective placement, the County offered Robert nothing. The circuit court acknowledged that "communication training and other assisted techniques[] could greatly improve the well being of

---

[6] The majority excuses the County for failing to provide Robert speech training or a neuropsychological exam. Remarkably, the majority blames Robert and his attorney, claiming they did not request a neuropsychological evaluation *at the end of the annual review hearing*, and noting Robert's attorney was not sure Robert would agree to the evaluation. Majority op., ¶27 n.9. The County bore the burden of proving Robert's impairments necessitated continuing his protective placement. Declining to request an exam that would provide additional insight into Robert's impairments does not excuse the County from failing to obtain the evidence needed to prove Robert's impairments were permanent. The majority fails to comprehend that when the circuit court appointed a guardian for Robert, it stripped Robert of his rights to make such decisions and transferred them to the guardian, ostensibly for Robert's benefit. As a legal matter, Robert's desires became irrelevant, as evidenced by the decision to permanently remove Robert from his home of 40 years and sell it, despite Robert's disagreement.

[Robert] and *may possibly eliminate the need for a guardianship and protective placement.*" (emphasis added). Improving Robert's communication skills would facilitate a proper evaluation of his critical thinking skills, which Dr. Braam was unable to assess because of Robert's expressive aphasia. Inexplicably, Robert never received speech or language training despite his ability to communicate being "his biggest barrier" to living independently.

¶73 Resorting to circular reasoning, the majority concludes Robert's "disability" is permanent or likely to be permanent because "[i]n light of [the circuit court's] factual findings," the County presented sufficient evidence. Majority op., ¶29. The majority further undermines its conclusions by glossing over what it mischaracterizes as "inconsistencies and reservations" in Dr. Braam's testimony and deferring to the circuit court to resolve "competing inferences" from the facts. Majority op., ¶¶27–29. The majority's own recitation of the facts regarding permanency, however, uncovers no inconsistency in Dr. Braam's testimony warranting deference to the circuit court to settle.

¶74 As the majority notes, Dr. Braam said "it was difficult to assess the extent and permanency of Robert's cognitive impairments due to his limited ability to communicate." *Id.*, ¶26. Dr. Braam also "testified that a neuropsychological evaluation would provide a more complete picture of Robert's cognitive defects and the potential for improvement." *Id.* The majority additionally acknowledges Dr. Braam "testified that communication training and use of assistive communication devices could be 'extremely helpful' and 'reduce his needs for guardianship.'" *Id.* The facts recited by the majority establish that Dr. Braam's testimony did not support even a likelihood of permanency. While Dr. Braam could opine that Robert's impairment at the time of the hearing interfered with his ability to care for himself independently, Dr. Braam simply could not say whether Robert's impairment was likely to be permanent in light of the possibility Robert could regain some of his cognitive abilities.

¶75 Rather than address the absence of *any* evidence to support the likely permanence of Robert's neurocognitive disability, the majority relies on inferences the circuit court *could have* made. *See* Majority op., ¶29. The majority merely infers that "even if Robert's communication were improved with therapy, the cumulative effect of his disabilities on his functioning would leave him unable to provide for his own care and custody." *Id.*, ¶27. The majority does not cite any evidence supporting its conclusion, preferring to punt that question to the circuit court instead of

completing the de novo review to which Robert was entitled, particularly given the gross deprivation of liberty he has suffered at the hands of the State. *Id.*, ¶¶27–29.

\* \* \*

¶76 "Let me go home, why don't you let me go home?" JOHNNY CASH, *I Want to Go Home*, *on* Songs of Our Soil (Columbia Recs. Sept. 1, 1959). While Robert's physical disabilities may have caused the courts to reasonably question his ability to care for himself in his home, Robert never received a legally sound answer as to why the State will not let him go home. The County plainly failed to satisfy the statutory standard for a protective placement. It produced virtually no evidence that Robert's neurocognitive condition was likely to be permanent. The majority neuters any meaningful appellate review for Robert, and for anyone similarly situated. While the County may have meant well, the law does not permit the government's good intentions to trample the individual liberty of our most vulnerable citizens. I dissent.

REBECCA FRANK DALLET, J., dissenting.

¶77    This court has never decided what standard of review appellate courts should use when reviewing whether sufficient evidence supports a circuit court's protective-placement order under WIS. STAT. § 55.08(1). The court of appeals, however, has long applied a mixed standard of review, accepting the circuit court's factual findings unless they are clearly erroneous, but reviewing the legal determination that each of the elements for protective placement under § 55.08(1) are satisfied by clear-and-convincing evidence de novo. *See, e.g.*, *Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377.

¶78    For the reasons identified by the concurrence and the Wisconsin Counties Association's amicus brief, it might make sense for us to hold that a different, more deferential standard applies to protective-placement cases in the future. *See generally* Justice Hagedorn's concurrence, ¶53. Nevertheless, it would not be appropriate to do so in this case, since the parties took the existing standard as a given, and made no argument that we should change it. For that reason, everyone—the majority, concurrence, and dissents—all agree that we should apply the existing mixed standard of review in this case. *See* majority op., ¶15 n.6; Justice Hagedorn's concurrence, ¶31; Justice Protasiewicz's dissent, ¶81; Justice Rebecca Grassl Bradley's dissent, ¶69.

¶79    Under that mixed standard of review, I agree with Justice Protasiewicz's dissent, and join it in full. As she correctly explains, a de novo review makes clear that the evidence was insufficient to support the circuit court's order to protectively place Robert. *See* Justice Protasiewicz's dissent, ¶108. Nevertheless, I write separately to emphasize that the correct standard of review to apply in these cases remains an open question, and one that we may revisit in a future case. Accordingly, I respectfully dissent.

JANET C. PROTASIEWICZ, J., with whom REBECCA FRANK DALLET, J., joins, dissenting.

¶80     I agree that Robert's appeal is not moot, but I disagree that the continuation of his protective placement was supported by sufficient evidence. The majority's contrary conclusion rests on its misapplication of the applicable standard of review. That error results in Robert's protective placement order being affirmed without a meaningful de novo review of whether the County presented sufficient evidence to establish that his impairments meet the standards for dangerousness and permanence set forth in WIS. STAT. § 55.08(1)(c) and (d).

¶81     The majority correctly identifies the two-tiered standard of review our appellate courts have used to evaluate challenges to the sufficiency of the evidence in protective placement proceedings. It purports to apply that standard, but its analysis essentially collapses the tiers into a single clear error inquiry. This is a departure from the way in which our appellate courts have applied the standard of review in protective placement and involuntary commitment appeals, but the majority declines to recognize it as such. It insists that it has conducted a de novo review of the sufficiency of the evidence and leaves for another day whether to adopt clear error as the standard of review. I am not persuaded; the clear takeaway from the opinions in this case is that Robert's protective placement order has received only clear error review in this court. This mismatch between what the majority says it is doing and what it actually does will, I fear, needlessly inject confusion into our protective placement jurisprudence. If clear error review (or its functional equivalent) is to govern protective placement appeals going forward, our state's bench and bar would benefit from a clear statement to that effect.

¶82     Instead, the majority confines itself to searching for clear error under the guise of conducting a de novo review, ignoring a substantial body of case law that recognizes an appellate court's obligation to independently review the sufficiency of the evidence. Because a de novo review of the County's evidence confirms that it was insufficient to carry the County's burden of proof as to dangerousness or permanence, I respectfully dissent.

I

¶83     Protective placements under WIS. STAT. ch. 55 are among the most significant infringements on individual liberty and autonomy that can be imposed absent a criminal conviction. *See Vitek v. Jones*, 445 U.S.

480, 491 (1980) (recognizing that involuntary commitment is "a massive curtailment of liberty" (citation omitted)). Protectively placed individuals can be stripped of their ability to make decisions on matters widely considered to be fundamental to personal freedom in our society, such as where to live, whom to marry, what medical care to obtain, and whether to vote. *See Kindcare, Inc. v. Judith G.*, 2002 WI App 36, ¶12, 250 Wis. 2d 817, 640 N.W.2d 839 (recognizing "the significant liberty interest a person has in living where and under what conditions he or she chooses"). Such placements can also be "indefinite in duration and thereby . . . tantamount to a life sentence to a nursing home or other custodial setting." *Jefferson County v. Joseph S.*, 2010 WI App 160, ¶13, 330 Wis. 2d 737, 795 N.W.2d 450 (quoting *Walworth County v. Therese B.*, 2003 WI App 223, ¶12, 267 Wis. 2d 310, 671 N.W.2d 377).

¶84 Given the importance of the individual interests at stake, and the extent to which an individual's liberty can be restricted, Wisconsin law imposes significant burdens that must be overcome before protective placement may be ordered. Relevant here, a petitioner seeking to start or continue protective placement for an individual must establish that the individual meets four statutory criteria. *See* WIS. STAT. §§ 55.08(1)(a)–(d), 55.18(3)(e). In addition, although protective placement proceedings are civil in nature, the petitioner's burden of proof is not the normal preponderance-of-the-evidence standard applicable in civil cases. Instead, the petitioner must present clear and convincing evidence that the individual satisfies the statutory standards. *See* WIS. STAT. § 55.10(4)(d); *Addington v. Texas*, 441 U.S. 418, 424 (1979) (noting use of clear and convincing standard "to protect particularly important individual interests in various civil cases").

¶85 Appellate review of protective placement decisions provides an additional layer of protection against erroneous deprivations of liberty. Where, as here, an individual challenges the sufficiency of the evidence to support a protective placement order, our courts have applied a two-tiered standard of review. A challenge to the circuit court's factual findings is reviewed deferentially; we do not disturb them unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2); *Coston v. Joseph P.*, 222 Wis. 2d 1, 22, 586 N.W.2d 52 (Ct. App. 1998). But an appellate court does not defer to a circuit court's determination that the evidence presented satisfies the legal standards for continued protective placement. That inquiry raises a question of law that is reviewed independently. *See Therese B.*, 267 Wis. 2d 310, ¶21; *Coston*, 222 Wis. 2d at 23.

¶86 The majority acknowledges this two-pronged standard of review, but focuses entirely on whether the circuit court's findings of fact relevant to dangerousness and permanence are clearly erroneous. Majority op., ¶¶20–29. It discusses the evidence presented by the County—Dr. Braam's testimony and report—but only within the confines of its clear error review. After locating no clear error in the court's factual findings, the majority declares, with little further analysis or explanation, that its de novo review of the evidence is complete and that the evidence presented is sufficient "[i]n light of" those findings. *Id.*, ¶¶24, 29.

¶87 In cabining its review of the evidence to the narrow and deferential clear error inquiry, the majority misapprehends the nature of Robert's arguments on appeal and leaves the sufficiency-of-the-evidence analysis unfinished. Robert does not challenge the court's factual findings; instead, he contends that the County's evidence did not establish, to a clear and convincing threshold, that he continues to meet the statutory standards for dangerousness and permanence. His arguments are directed to the second part of the standard of review, which requires a reviewing court to make a legal determination—whether the County presented sufficient evidence to establish dangerousness and permanence.

¶88 The majority conducts no meaningful de novo review of the sufficiency of the evidence. Its analysis is out of step with how this court and the court of appeals have addressed sufficiency-of-the-evidence challenges in protective placement and involuntary commitment actions. When the sufficiency of the evidence in a protective placement proceeding is challenged on appeal, the reviewing court considers the testimony and other evidence underlying the circuit court's factual findings and evaluates whether that evidence satisfies the relevant statutory standards. *See Wood County v. J.A.B.*, No. 2025AP220, unpublished slip op., ¶26 (Wis. Ct. App. Aug. 21, 2025).[1] We consider whether the party with the burden of proof has presented evidence that is enough to meet its burden, and whether the evidence addresses each part of the statutory standard. Our court of appeals has engaged in this type of analysis repeatedly when addressing sufficiency-of-the-evidence challenges in protective placement appeals. *See, e.g., Douglas County v. M.L.*, No. 2022AP141, unpublished slip op., ¶¶20–26 (Wis. Ct. App. Dec. 28, 2023) (summarizing evidence

---

[1] All unpublished decisions cited in this dissent are one-judge opinions that are citable under WIS. STAT. § (Rule) 809.23(3)(b).

presented at hearing on continued protective placement and analyzing de novo whether it "established, by clear and convincing evidence, the four elements for continued protective placement"); *Clark County v. R.D.S.*, No. 2022AP229, unpublished slip op., ¶¶8–21 (Wis. Ct. App. Aug. 18, 2022) (reviewing hearing testimony to assess sufficiency of evidence that individual was dangerous); *Wood County v. Zebulon K.*, Nos. 2011AP2387 & 2011AP2394, unpublished slip op., ¶¶13–17 (Wis. Ct. App. Feb. 7, 2013) (reviewing reports and testimony from social worker and examining psychologist and concluding that record failed to establish dangerousness); *Coston*, 222 Wis. 2d at 23–26 (examining testimony and reports to determine sufficiency of evidence to support guardianship and protective placement orders).

¶89 We have also conducted similar de novo reviews in addressing sufficiency-of-the-evidence challenges in involuntary commitment proceedings under WIS. STAT. ch. 51. Two terms ago, in *Waukesha County v. M.A.C.*, we held that a county had not presented sufficient evidence to support an involuntary medication order under WIS. STAT. § 51.61(1)(g)4. *M.A.C.*, 2024 WI 30, ¶¶63–71, 412 Wis. 2d 462, 8 N.W.3d 365. Although the circuit court had made factual findings that satisfied the statute's requirements, we nonetheless independently examined the evidence upon which the county had relied and "determine[d] that the [c]ounty failed to meet its clear and convincing burden" as to one of those requirements. *Id.*, ¶68. Similarly, in *Marathon County v. D.K.*, we reviewed the evidence de novo to determine whether it clearly and convincingly established that the individual was dangerous under WIS. STAT. § 51.20. *D.K.*, 2020 WI 8, ¶¶44–54, 390 Wis. 2d 50, 937 N.W.2d 901. The committed individual in *D.K.* did not challenge the circuit court's findings of fact as clearly erroneous. Thus, our review proceeded without deference to the circuit court's decision and examined the hearing evidence and findings "to decide whether there was clear and convincing evidence that D.K. was dangerous[.]" *Id.*, ¶44; *see also Langlade County v. D.J.W.*, 2020 WI 41, ¶¶50–58, 391 Wis. 2d 231, 942 N.W.2d 277 (conducting de novo review of examining doctor's testimony to determine if it was sufficient to establish that committed individual satisfied a standard for dangerousness under § 51.20). The majority fails to mention these authorities, much less attempt to explain how its analytical approach in this case comports with them.

¶90 In departing from the well-worn analytical path laid by these cases, the majority employs an analysis that more closely resembles the "clear error only" standard of review it purportedly declines to adopt.

Majority op., ¶15 n.6. That decision is significant in this case because, as explained below, the County's evidence was not sufficient to carry its burden of proof with respect to either dangerousness or permanence.

II

¶91    To prove that Robert continues to be dangerous, the County had to establish that he has an incapacity that makes him "so totally incapable of providing for his . . . own care or custody as to create a substantial risk of serious harm to himself . . . or others." *See* WIS. STAT. § 55.08(1)(c). As the statutory language suggests, this is a demanding standard to meet. *See Jackson Cnty. Dep't of Health & Hum. Servs. v. Susan H.*, 2010 WI App 82, ¶21, 326 Wis. 2d 246, 785 N.W.2d 677 (legislature's choice of words in paragraph (1)(c) makes clear that only "severe incapacities" will justify protective placement). For starters, only a "risk of serious harm" will suffice; as the court of appeals has noted, "minor accidents, injuries and illness are not sufficient to satisfy this requirement." *Zander v. County of Eau Claire*, 87 Wis. 2d 503, 515, 275 N.W.2d 143 (Ct. App. 1979).

¶92    Additionally, the risk that serious harm will come to pass must be "substantial." § 55.08(1)(c). That is to say, serious harm must be foreseeable, not a matter of speculation or guesswork. *See Zander*, 87 Wis. 2d at 515.

¶93    Finally, the substantial risk of serious harm must arise because the individual is "so totally incapable" of looking after "his or her own care or custody." § 55.08(1)(c). "Care" and "custody" are not defined in chapter 55, but care has been construed to refer to an individual's daily needs and custody to an individual's ability to protect himself or herself "from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Susan H.*, 326 Wis. 2d 246, ¶17. The statute requires that an individual be "totally incapable" of such care and custody. Thus, it is not enough for an individual to need some assistance with daily activities or managing his or her affairs, or to have mild impairment in performing these tasks. The statute only permits continued protective placement if an individual's ability to look after daily needs or protect against abuse, financial exploitation, or neglect is so impaired that the individual faces a substantial risk of serious harm.

¶94    Together, these three components of § 55.08(1)(c) require a court assessing dangerousness to evaluate three things: (1) the extent to

which the individual's incapacities interfere with his ability to provide for his care and custody (the individual must be "totally incapable" of doing so); (2) the degree of harm to which his incapacities expose him (the harm must be "serious"); and (3) the likelihood that that harm will come to pass (the risk must be "substantial").

¶95 The County relied exclusively on the report and testimony of Dr. Braam to meet its burden of proof. I agree with the majority that the circuit court found Braam credible and relied on his report and testimony in its oral ruling. I do not, as Justice Hagedorn posits, second-guess the circuit court's factual findings. Nor do I endeavor to reweigh competing bodies of evidence or draw different inferences from the circuit court. Instead, consistent with the cases discussed above that have applied the mixed standard of review, I independently examine whether the County's evidence is sufficient to satisfy the legal standard for dangerousness. In my view, the evidence introduced through Braam was not sufficient to establish, to a clear and convincing degree, that Robert met that standard.

¶96 As the majority notes, the evidence concerning Robert's dangerousness centered around his neurocognitive disorder resulting from a stroke, expressive aphasia, and hemiparesis, or muscle weakness, on the right side of his body. Majority op., ¶20. Braam described impairments in Robert's cognitive and physical abilities resulting from these conditions.

¶97 With regard to Robert's cognitive impairment, Braam expressed concern that Robert's ability to think critically was diminished and interfered with his ability to "evaluate complex situations." At the hearing, Braam testified that Robert "has difficulties with higher level thinking to be able to make . . . informed decisions." Braam acknowledged that he did not "know how much of a concern" Robert's critical thinking skills presented but maintained that they "interfere the most with [his] ability to make decisions" and "protect himself from financial abuse and protect his health and safety." This evidence is too vague in light of the specificity required under the standard for dangerousness in WIS. STAT. § 55.08(1)(c). The County failed to connect Robert's impaired critical thinking skills to specific "complex" decisions or situations related to his care or custody. Nor did Braam explain why his diminished ability to think critically would render him "so totally incapable of" handling such situations as to create a specific and foreseeable risk of serious harm to him. *See id.* We do not know what specific care or custody concerns stem

from Robert's cognitive impairment or the extent to which his cognitive impairment interferes with those tasks.

¶98    The closest the County gets to identifying any specific care or custody incapacity concerns Robert's ability to plan and take medication as scheduled. There too, however, the County did not present clear and convincing evidence to meet the statutory standard for dangerousness. Braam testified that Robert was compliant with his prescribed medications, but indicated in his report that he requires assistance with "medication planning and initiation." At no point however, did Braam identify any of the medications Robert was taking, the dosage and frequency of each, the illnesses or conditions for which they were prescribed, or how Robert's mental or physical condition might be effected if he did not take them as prescribed.[2] We are thus left to speculate as to the likelihood that Robert would be harmed if he became noncompliant with his medications, and the degree of harm to which that noncompliance would expose him.[3]

¶99    Even absent this information, it might be reasonable to infer that Robert's failure to take his medications as prescribed would create *some* risk of harm. But that would still fall short of the *substantial* risk of *serious* harm that § 55.08(1)(c) requires. *See R.D.S.*, No. 2022AP229, ¶14 (concluding that psychologist's testimony that individual "could decompensate [and] become more paranoid" was insufficient to support determination of dangerousness absent "evidence as to whether, and how, by 'decompensating' and becoming 'more paranoid,' R.D.S. would be at substantial risk of endangering himself or others"); *Outagamie Cnty. Dep't of Health & Hum. Servs. v. L.C.E.*, No. 2023AP929, unpublished slip op., ¶15 (Wis. Ct. App. June 4, 2024) (testimony that individual might stop taking

---

[2] Braam's report identifies only one medication, alprazolam, that Robert was apparently prescribed for "anxiety reduction." The report provides no other information about this medication.

[3] Contrary to the majority's suggestion, I do not take issue with the circuit court's determination that Robert "needs assistance in remembering to take [his medications] in the correct doses and at the proper times." Majority op., ¶23 n.8. My point is different: the mere fact that Robert needs assistance in this regard is not sufficient, by itself, to establish that he meets the standard for dangerousness in WIS. STAT. § 55.08(1)(c).

medication absent protective placement was too "speculative and vague" to support determination of dangerousness without explanation of why medication was prescribed, "what symptoms may reappear if she stops taking medication," and how cessation would seriously harm individual or others).

¶100   Turning to Robert's physical limitations, Braam noted in his report that Robert's hemiparesis causes him to experience weakness and limited range of motion on his right side and requires him to use a walker to move around. Braam also noted, in his report and his testimony, that Robert requires "assistance" with daily tasks like bathing, preparing meals, doing laundry, taking medication, and coordinating and attending medical appointments. The circuit court appears to have relied on this evidence when it identified Robert's "physical impairments" as impacting "his ability . . . to live independently on his own and provide the self-care associated with that."

¶101   Braam's observations about Robert's physical limitations and his need for assistance with self-care and household tasks are insufficient as a matter of law to establish dangerousness. Braam did not explain the extent of assistance Robert requires, and the County did not present testimony from another witness about Robert's day-to-day functioning and limitations. We do not know whether Robert is totally reliant on staff at the adult family home where he resides, whether he can complete some tasks with minimal assistance, or something in between. These details matter; without further elaboration, a bald assertion that Robert requires "assistance" with activities of daily living does not furnish a sufficient basis to evaluate his capabilities and assess risk and harm. It falls far short of the clear and convincing evidence required to establish that he is "so totally incapable of" caring for himself that he faces "a substantial risk of serious harm." *See* § 55.08(1)(c).

III

¶102   The second criteria that Robert contests required the County to establish that he "has a disability that is permanent or likely to be permanent." *See* WIS. STAT. § 55.08(1)(d). Although Braam checked a box in his report indicating that Robert met this standard, he conceded elsewhere in his report and in his testimony that he lacked sufficient information to make any prediction about whether Robert's impairments were likely permanent.

¶103 In his report, Braam wrote that he did not know whether anyone had a "thorough understanding" of Robert's condition. He acknowledged that Robert had not undergone a neurocognitive evaluation to identify "the extent of his cognitive impairments." He further conceded that additional subsequent evaluations would be needed to determine if those impairments showed "improvement over time."

¶104 With respect to Robert's physical limitations, Braam's report credited Robert's claim that he underwent rehabilitation following his stroke and regained the ability "to work and live on his own with support services." Though Robert required assistance to complete daily activities at the time of Braam's evaluation, Braam acknowledged that Robert's history suggested a "potential for such improvement to occur again." Regarding Robert's aphasia, as the majority acknowledges, Braam did not describe this as a permanent condition, but instead one that could be significantly improved through "communication training and use of assistive communication devices."

¶105 When asked directly at the hearing to make a prediction about the permanency of Robert's impairments, Braam acknowledged that he could not do so based on the incomplete record available to him:

> Well, that's the difficult question because even though [Robert's] impairment might be significant right now, there is a possibility that he has the ability to regain some of his cognitive abilities. We don't know that for sure. He has never to the best of my knowledge had a neuropsychological evaluation to completely map out what his cognitive deficits are and the possibility that they might improve.
>
> It also—there also appears to be some time after his first medical event that he was able to function on his own. That would speak to his ability to regain some competency at this point in time, but there's just fairly large gaps in information that we don't know. I don't know that I can make any prediction about that.

¶106 Braam conceded that he lacked an understanding of Robert's cognitive deficits and could not offer a prediction about whether they might improve over time. He similarly acknowledged "large gaps in information" when referring to Robert's recovery following his stroke. This appears to relate to Robert's physical impairments, about which

Braam also declined to make a prediction. These concessions lay bare the absence of support in the record to support a determination that any of Robert's impairments are, or are likely to be, permanent.

¶107 The majority cobbles together a rationale to support the circuit court's decision that relies on inferences it ascribes to that court. In the majority's telling, the circuit court inferred that Robert would require assistance due to his cognitive and physical impairments apart from his aphasia and that no other interventions would mitigate those impairments. Majority op., ¶29. But that view of the circuit court's inferences is undermined by that court's reasoning and the evidence presented. Those inferences were not part of the court's meager reasoning on the issue of permanence, which turned entirely on a purported lack of "follow-up" regarding Robert's physical impairments in Braam's testimony. The majority's effort also unduly minimizes the nature and significance of Braam's concession that he could not make a prediction about the permanency of Robert's condition based on the record available to him. That admission compels a conclusion that the County failed to establish by clear and convincing evidence that Robert's impairments are, or are likely to be, permanent.

***

¶108 The majority fails to faithfully apply the well-established standard of review applicable to protective placement appeals and affirms Robert's continued placement based on a record that fails to clearly and convincingly establish that he is a danger to anyone or that his condition is likely permanent. I respectfully dissent.